UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

OZONE INTERNATIONAL, LLC,
a Washington limited liability
company,

              Plaintiff,

   v.

WHEATSHEAF GROUP LIMITED, a
foreign private limited company
registered in England and Wales,

              Defendant.

No. 2:19-cv-01108-RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the Court on Defendant's Motion for Partial Summary Judgment, Dkt. # 65, and Motion to Dismiss for Failure to State a Claim, Dkt. # 81.  For the reasons stated below, the Court **GRANTS** both motions, Dkt. ## 65, 81.

## II.  BACKGROUND

Plaintiff Ozone International, LLC ("Ozone or "Plaintiff") is a Washington-based company that developed an ozone machine that significantly extends the shelf-life of

ORDER – 1

food and beverage products. Dkt. # 79 ¶ 1. In January 2016, Ozone began discussions with Defendant Wheatsheaf Group Limited ("Wheatsheaf" or "Defendant") regarding Wheatsheaf's potential acquisition of Ozone. *Id.* ¶ 20. In 2017, Wheatsheaf formed two subsidiaries, Wheatsheaf U.S. ("WGUS") a Delaware corporation with a principal place of business in Minnesota, and Wheatsheaf Group US Food Safety LLC d/b/a TriStrata ("TriStrata"), a Delaware limited liability corporation based in Washington. *Id.* ¶ 26; Dkt. # 4, Ex. F. Anthony James, Wheatsheaf's Chief Operating Officer, negotiated terms on behalf of Wheatsheaf and TriStrata. Dkt. # 79 ¶ 29.

On August 17, 2017, Ozone entered into an Asset Purchase Agreement ("APA") with TriStrata whereby TriStrata acquired a substantial number of Ozone's assets, excluding certain contracts ("the Excluded Contracts") over which Ozone retained ownership. Dkt. #1-1, Ex. A. Pursuant to the APA, Ozone transferred its operating assets to TriStrata for $9.99 million, defined in the APA as the "Purchase Price." Dkt. # 83 at 3; Dkt. # 1-1 at 45. Ozone retained ownership of the Excluded Contracts, which Ozone states were worth $30 million. Dkt. # 76 at 3. Wheatsheaf was included as a party to the APA "solely for the purposes of Section 6.05 and any provisions of Article I, Article IX, and Article XI as they relate to Section 6.05." Dkt. # 1-1 at 45. Pursuant to Section 6.05, "[TriStrata] has sufficient cash on hand or other sources of immediately available funds to enable [TriStrata] to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement." *Id.* In Section 6.07 of the APA, TriStrata represented that it would "be able to pay its debts as they become due" and that "[i]n connection with the transactions contemplated hereby, [TriStrata] has not incurred, and has no plans to incur, debts beyond its ability to pay as they become absolute and matured." *Id.*

On September 22, 2017, TriStrata and Ozone entered into a second agreement, the Transition Services Agreement ("TSA"), providing for the transition of Ozone's Excluded Contracts to TriStrata over a period of time. Dkt. # 65 at 7; Dkt. #1-1, Ex. B.

ORDER – 2

Wheatsheaf was not a party to the TSA. Dkt. #1-1, Ex. B. Pursuant to the TSA, TriStrata agreed to service the Excluded Contracts and, in exchange, Ozone agreed to pay TriStrata a service fee. Dkt. #1-1, Ex. B, § 4.02. Under Section 2.05 of the APA, the Purchase Price included a $1.5 million credit for to pay TriStrata for its servicing of the Excluded Contracts under the TSA. Dkt. # 79 ¶ 34. Pursuant to the TSA, TriStrata agreed to pay a "Transfer Price" for any Excluded Contract where the customer entered into a new contract with TriStrata. Dkt. #1-1, Ex. B. On September 25, 2017, the APA closed for a purchase price of $9.99 million. Dkt. # 65 at 7.

On May 31, 2019, TriStrata filed a petition for the appointment of a receiver to commence a court-administered receivership captioned, *In re Receivership of WGUS FS LLC dba TriStrata*, Case No. 19-2-14553-6 SEA (King Cty. Sup. Ct.) (the "Receivership") in King County Superior Court. Dkt. # 79 ¶ 2. The superior court appointed Orse & Company, Inc. (the "Receiver") as a general receiver. Dkt. # 65 at 10. On August 16, 2019, the court entered an order granting the Receiver's motion to assume and assign contracts and leases and sale of related assets, including customer contracts at issue in the APA and TSA. *See* Dkt. # 66-3; Dkt. # 56 at 10. The court transferred several assets from TriStrata to Ozone and declared that upon such transfer, Ozone "shall be deemed to have waived and released any and all claims to any remaining assets owned by [TriStrata]." *Id.* at 3. On November 13, 2019, the court terminated the Receivership. *See* Dkt. # 66-4. The court noted that "[a]ny claims and rights of action available to Ozone . . . under applicable law are hereby reserved subject to all third-party defenses available under applicable law, and, except as expressly set forth by prior orders of this Court, are not waived or otherwise impaired by this receivership." *Id.* at 3.

Several months before the receivership was terminated, Ozone sued Wheatsheaf in this Court and moved for a temporary restraining order and preliminary injunction. Dkt. # 3. In its complaint, Ozone alleged that Wheatsheaf breached Section 6.05 of the APA—the only section to which it was a party—by failing to provide sufficient funding

ORDER – 3

for TriStrata to pay Ozone as required under the TSA. Dkt. # 1 at 13. Ozone also alleged that Wheatsheaf committed fraud and negligent misrepresentation based on the same section and sought declaratory judgment that Wheatsheaf is an alter ego of TriStrata and Wheatsheaf U.S. ("WGUS"), another Wheatsheaf subsidiary. *Id.* at 15. The Court denied Ozone's motion for a temporary restraining order and preliminary injunction. Dkt. # 13. Wheatsheaf later filed a motion for partial summary judgment. Dkt. # 21. On May 6, 2020, the Court denied Wheatsheaf's motion as premature, granting Ozone's request for additional discovery under Rule 56(d) to allow time for the parties to engage in "a reasonable amount of discovery." Dkt. # 37 at 7.

Seven months later, Wheatsheaf filed the pending motion for partial summary judgment with respect to Ozone's claims for breach of contract, fraud, and negligent misrepresentation. Dkt. # 65 at 3. A month later, on January 6, 2021, Ozone filed an amended complaint asserting the same three claims, again seeking declaratory relief that Wheatsheaf, as the alter ego of TriStrata and WGUS, is liable for TriStrata's obligations to Ozone, and asserting a breach of the implied covenant of good faith and fair dealing. Dkt. # 79 at 13-18.

On January 19, 2021, King County Superior Court Judge Judith Ramseyer denied Ozone's cross-motion for summary judgment in *WGUS BCO LLC d/b/a/ Ozark v. Ozone Int'l, LLC*, No. 20-2-07562-1-SEA, confirming that Ozone had waived and released any remaining claims against TriStrata in exchange for valuable assets as part of a compromise approved by Superior Court Judge Marshall Ferguson on August 16, 2019. Dkt. # 82-21 at 3-4. Ozone had filed a Receivership Proof of Claim asserting that TriStrata owed Ozone $31 million because TriStrata allegedly breached the TSA and APA. *Id.* Judge Ramseyer concluded that "[t]he fact that Ozone filed its Proof of Claim in the Receivership does not mean that its $31 million claim was established as a matter of law, or that Ozone may continue to assert that claim against third-parties." *Id.* at 3.

The same day, Wheatsheaf filed the pending motion to dismiss Ozone's latter two

claims. Dkt. # 81 at 3-4.

### III. LEGAL STANDARD

**A. Motion for Summary Judgment**

Wheatsheaf moves for summary judgment on Ozone's breach of contract, fraud, and negligent misrepresentation claims. Dkt. # 65. As discussed in the Court's prior order, summary judgment is appropriate if there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp*., 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 150-51 (2000).

**B. Motion to Dismiss for Failure to State a Claim**

Wheatsheaf moves the Court to dismiss Ozone's alter ego claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and Ozone's good faith and fair dealing claim under Rule 12(b)(6). Dkt. # 81. Under Rule 12(b)(1), a court may dismiss a claim for lack of subject matter jurisdiction. An argument against jurisdiction may be facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the moving party claims that the allegations in the complaint "are insufficient on

their face to invoke federal jurisdiction." *Id.* In a factual attack, the moving party disputes the truth of the allegations that would invoke federal jurisdiction. *Id.*

Under Rule 12(b)(6), a court may dismiss a complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). The court must assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from those allegations. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). A court "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Instead, the plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007). If the plaintiff succeeds, the complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief. *Twombly*, 550 U.S. at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On a motion to dismiss, a court typically considers only the contents of the complaint. However, a court is permitted to take judicial notice of facts that are incorporated by reference in the complaint. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials documents attached to the complaint, documents incorporated by reference in the complaint"). A court may take "take judicial notice of court filings and other matters of public record" in consideration of a motion to dismiss. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 (9th Cir. 2006). Indeed, a court may "properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment." *Mack v. S. Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *abrogated by Astoria Fed. Sav. & Loan Ass'n v. Solimino on other grounds*, 501 U.S. 104 (1991). With these principles in mind, the Court turns to the instant motion.

## IV. DISCUSSION

### A. Wheatsheaf's Motion for Partial Summary Judgment

ORDER – 6

In its first pending motion, Wheatsheaf moves for summary judgment on three of Ozone's claims: breach of contract, fraud, and negligent misrepresentation. Dkt. # 65 at 3. Each claim is based on Ozone's interpretation of a single provision in the APA. Dkt. # 79 at 13-16. The Court will examine each claim in turn.

### 1. Breach of Contract Claim

The crux of the parties' contractual dispute surrounds Wheatsheaf's obligations as set forth in Section 6.05 of the APA. The section provides that "[TriStrata] has sufficient cash on hand or other sources of immediately available funds to enable [TriStrata] to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement." Dkt. # 1-1 at 45. The parties do not dispute that Wheatsheaf was a party to the APA "solely for the purposes of Section 6.05" to ensure that TriStrata had sufficient funding to pay the Purchase Price for Ozone's assets. *Id.* at 6. Their disagreement lies in the meaning of the phrase "the transactions contemplated by this Agreement." *Id.* at 45.

Ozone interprets this phrase broadly, claiming that transactions contemplated by the APA included "all obligations under the TSA" as well. Dkt. # 79 at 13. Specifically, Ozone asserts that the APA "expressly include[s] the transfer of contracts, equipment, and inventory that TriStrata needed to acquire in the months and years that followed under the [TSA] which was attached as Exhibit D to the APA and expressly incorporated fully therein." Dkt. # 74 at 3. Ozone argues that its interpretation is supported by (1) a plain language analysis of the contract; (2) Wheatsheaf's continued financing of TriStrata's obligations to Ozone after the closing of the APA; and (3) the negotiations and context of the parties' agreement, which demonstrate the parties' intent. *Id.* at 3-4. Ozone alternatively argues that Wheatsheaf's motion for summary judgment should be denied under Rule 56(d) because Wheatsheaf has withheld discovery and failed to provide "significant material documents and information," thereby precluding Ozone from presenting facts essential to support its opposition to Wheatsheaf's motion. *Id.* at 4.

ORDER – 7

1     Wheatsheaf, however, contends that Ozone's broad interpretation is "deeply
2   flawed" and inconsistent with the language of the APA.  Dkt. # 65 at 3.  Specifically,
3   Wheatsheaf contends that "the consummation of the transactions contemplated by this
4   agreement" is explicitly defined in the APA as "the Closing."  Dkt. # 1-1 at 22.  Section
5   3.01 defines it accordingly:

> Subject to the terms and conditions of this Agreement, the consummation of the
> transactions contemplated by this Agreement (the "**Closing**") shall take place at
> the offices of DLA Piper . . . on the first (1st) Business Day after all of the
> conditions to Closing set forth in **Article VIII** are either satisfied or waived (other
> than conditions which, by their nature, are to be satisfied on the Closing Date), or
> at such other time . . . .

*Id.*

      Wheatsheaf asserts that this definition limits the transactions for which
Wheatsheaf is obligated to pay.  It is obligated, it argues, to pay only for those
transactions contemplated specifically by the APA, or "this Agreement," in
contradistinction to those contemplated by the TSA, which is not mentioned in Section
6.05.  Dkt. # 65 at 14.  Wheatsheaf disputes Ozone's allegation that the Section 6.05 of
the APA required Wheatsheaf "to indefinitely fund TriStrata's potential liabilities after
the Closing."  *Id.*  Wheatsheaf argues that Ozone's broad interpretation of Wheatsheaf's
obligations under Section 6.05 is not supported by the plain language of the APA nor by
any evidence following months of discovery and the production of thousands of
documents.  *Id.* at 14-15.

      In interpreting the disputed provision, the Court must construe it in accordance
with Washington state law, pursuant to Section 11.10(a) of the APA.  Dkt. # 1-1 at 67.
Washington follows the objective manifestation theory of contracts.  *Hearst Commc'ns,
Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005).  Under this theory, the Court
must focus on the objective manifestations of the contract, as opposed to the subjective
intent of the parties.  *Id.*  Washington courts "impute an intention corresponding to the

ORDER – 8

reasonable meaning of the words used." *Id.* "The subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." *Id.*

To evaluate the intent of the parties in entering into an agreement and the ascertain the meaning of the words used, Washington courts have adopted the "context rule" under which extrinsic evidence may be considered. *Pelly v. Panasyuk*, 413 P.3d 619, 629 (Wash. Ct. App. 2018) (citing *Berg v. Hudesman*, 801 P.2d 222 (Wash. 1990)). Under this rule, "[s]uch evidence is admissible regardless of whether the language in the document is ambiguous." *Id.* The use of extrinsic evidence, however, is limited to "illuminate what was written, not what was intended to be written." *Hollis v. Garwall, Inc.*, 974 P.2d 836, 843 (Wash. 1999). Evidence may not be used to show "a party's unilateral or subjective intent as to the meaning of a contract word or term"; to show "an intention independent of the instrument"; or to "vary, contradict or modify the written word." *Id.* "Evidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument." *Berg*, 801 P.2d at 229–30. In accord with Washington law, the Court will consider the objective manifestations of the contract based on the reasonable meaning of the plain language and consider extrinsic evidence in illuminating the plain language.

### a. Plain Language of the APA

Under Washington law, "[w]hen the same word is used in different parts of a contract it is presumed that the word means the same throughout." *Bellevue Sch. Dist. No. 405 v. Bentley*, 684 P.2d 793, 798 (Wash. Ct. App. 1984). In the APA, "the consummation of the transactions contemplated by this Agreement" is explicitly defined as the "Closing" in Section 3.01. Ozone's argument that the exact same phrase, "the transactions contemplated by this Agreement," has a different meaning in Section 3.01 than it does when used in Section 6.05 is thus problematic under Washington law. Dkt. # 74 at 18.

ORDER – 9

Indeed, Ozone's contention that "all Transaction Documents—including the TSA—are integral to the APA and thus 'contemplated by this Agreement'" does not reflect or align with the language of the APA. Dkt. # 74 at 18. Ozone's argument makes redundant any use of the phrase the "transactions contemplated by the APA and the Transaction Documents[1]" or "transactions contemplated hereby and thereby" in explicit reference to the APA and the Transaction Documents. The APA, however, contains at least fourteen such explicit references. *See* Dkt. # 1-1 at 25-57 (APA, §§ 2.02, 4.02, 4.03, 5.01, 5.04, 6.02, 6.03, 7.09, and 8.02). Ignoring such references or interpreting them as meaningless is inconsistent with Washington law. *See Pelly*, 413 P.3d at 629 (holding that "[i]nterpretations giving lawful effect to all the provisions in a contract are favored over those that render some of the language meaningless or ineffective").

Moreover, this phrase explicitly referring to transactions contemplated by both the APA and the Transaction Documents, which includes the TSA, was not used in Section 6.05. Ozone provides no explanation for this. If the parties intended to hold Wheatsheaf financially liable for all transactions contemplated by the APA as well as the TSA, the appropriate language to convey that intention was familiar to the parties and used repeatedly in various other sections. The numerous references to the broader scope of transactions contemplated by both the APA and the Transaction Documents makes it clear that the absence of this language in Section 6.05 and focus instead on transactions contemplated by "this Agreement" restricted the scope of Wheatsheaf's obligations to those explicitly contemplated by the APA, defined as the Closing. When the APA is read as a whole, the transactions contemplated by "this Agreement" are distinct from those transactions contemplated by the APA and the TSA and are limited to those required for

---

[1] The term "Transaction Documents" is defined as a group of agreements including the TSA, the Bill of Sale, Buyer Operating Agreement, the Assignment and Assumption Agreement, and "other agreements, instruments and documents required to be delivered at the Closing." Dkt. # 1-1 at 14-15.

ORDER – 10

the closing pursuant to the definition.

Indeed, the parties negotiated over Wheatsheaf's role in the agreements and agreed that (1) Wheatsheaf would not be a party to the TSA, and (2) Wheatsheaf's role in the APA would be limited to "Section 6.05, and any provisions of Article I, Article IX, and Article XI as they relate to Section 6.05." Dkt. 1-1 at 6. Ozone's contention that Wheatsheaf was nevertheless liable for all of TriStrata's financial obligations in both the APA and the TSA is confounding.

### b. *Extrinsic Evidence of the Parties' Intent*

Ozone claims that "the extrinsic evidence regarding negotiations and execution of the APA confirms the parties' intent that [Wheatsheaf] be bound beyond funding amounts due at closing." Dkt. # 74 at 22. Ozone asserts that the parties had agreed that Section 6.05 entailed the sustained financial support of Wheatsheaf, without which "[t]he deal simply could not work." *Id.* at 24. According to Ozone, it "made clear that, without [Wheatsheaf's] financial support of all of TriStrata obligations, Ozone never would have entered in the APA." Dkt. # 74 at 23. Ozone cites Wheatsheaf's involvement and representation in post-closing activities and transactions as evidence of its expansive obligations under the APA. *Id.* at 21. Ozone also cites Wheatsheaf's commitment of $35 million of additional funding to TriStrata for transactions with Ozone, a $2.5 million loan to TriStrata, and a "further investment by Wheatsheaf in the region of $30m" as course of performance evidence demonstrating the meaning of all "transactions contemplated by" the APA. *Id.* at 20. The Court is unpersuaded.

First, Ozone's statements—and that of its prior attorney—regarding its own intentions in entering the contract is not proper evidence under Washington law. *See Lynott v. Nat'l Union Fire Ins. Co.*, 871 P.2d 146 (Wash. 1994) (holding that "[u]nilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the parties' intentions"). Second, Ozone's conclusory statements about Wheatsheaf's contractual intentions based on its involvement in post-closing

activities are unsupported.  As Wheatsheaf correctly notes, "[a] parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego."  *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1074 (9th Cir. 2015).  The mere fact that Wheatsheaf made further investments in TriStrata after the closing of the APA is not evidence that Wheatsheaf was contractually required to do so.  *See Calvert v. Huckins*, 875 F. Supp. 674, 679 (E.D. Cal. 1995) (holding that it is a "common business practice and a normal feature of parent-subsidiary relationships" for a parent company to guarantee a subsidiary's promissory note or loan).

Having considered the objective manifestation of the APA and finding no evidence demonstrating the parties' intent that Wheatsheaf's obligations would continue after the closing, the Court concludes that "transactions contemplated in this Agreement" is properly construed as transactions related to the Closing.  The Court therefore concludes that Ozone's breach of contract claim fails as a matter of law.

### 2.  Fraud and Negligent Misrepresentation Claims

Having concluded that Wheatsheaf's obligations under Section 6.05 were expressly limited to (1) paying the Purchase Price and (2) paying for the transactions required for the APA closing, the Court concludes Ozone's claims of fraud and negligent misrepresentation, which are contingent upon Ozone's misinterpretation of the section, must also fail.  "Under Washington law, a fraud claim requires proof of nine elements: (1) a representation of an existing fact; (2) materiality of this representation; (3) falsity of the representation; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) intent that the representation be acted on; (6) ignorance of its falsity by the person to whom the representation is made; (7) reliance on the truth of the representation; (8) a right to rely on the representation; and (9) consequential damages.  *Bisson v. Bank of Am., N.A.*, 919 F. Supp. 2d 1130, 1137 (W.D. Wash. 2013) (citing *Kirkham v. Smith*, 23 P.3d 10, 13 (Wash. Ct. App. 2001)).  Ozone alleges that Wheatsheaf committed fraud by

falsely representing that TriStrata "had sufficient cash on hand or other sources of immediately available funds to enable [TriStrata] to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement," which included funding TriStrata's transactions under the TSA. Dkt. # 74 at 24. Dkt. # 79 at 15. As the Court concluded above, Wheatsheaf made no such contractual representation. Nowhere in the APA did Wheatsheaf commit to fund TriStrata indefinitely beyond the Purchase Price and Closing. Ozone's flawed interpretation of Section 6.05 misrepresents Wheatsheaf's obligations. There is no evidence Wheatsheaf made a false representation. In the absence of a false representation, Ozone's claims of fraud and negligent misrepresentation fail.

### 3. Rule 56(d) Request to Defer Consideration

Finally, Ozone again asks the Court to deny Wheatsheaf's motion for partial summary judgment under Federal Rule of Civil Procedure 56(d). Dkt. # 74 at 13. Under Rule 56(d), the Court may deny or defer consideration of the motion for summary judgment when the nonmoving party shows that, for specified reasons, "it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Ozone alleges that despite the Court's May 6, 2020 order denying Wheatsheaf's prior motion for summary judgment and ordering the parties to engage in "a reasonable amount of discovery," Wheatsheaf has failed to provide sufficient responses to Ozone's requests. Dkt. # 74 at 14. Wheatsheaf argues that it has engaged in "substantial discovery" in which it has produced thousands of documents that relate to the APA, Section 6.05, and their negotiation. Dkt. # 65 at 11. Ozone has produced thousands of documents in turn. *Id.* The Court permitted the parties to engage in a reasonable amount of discovery, but now concludes that further extrinsic evidence is irrelevant because, as noted above, the scope of the "transactions contemplated by this Agreement" is explicitly defined and limited by the written contract. *See Hollis*, 974 P.2d at 843 (holding that the use of extrinsic evidence is limited to "illuminate what was written, not what was intended to be

written").  The Court finds no reason for further delay and denies Ozone's Rule 56(d) motion.

**B.  Wheatsheaf's Motion to Dismiss**

In its motion to dismiss, Wheatsheaf moves the Court to dismiss Ozone's good faith and fair dealing and alter ego claims for failure to state a claim pursuant to Rule 12(b)(6).  Dkt. # 81 at 12.  Wheatsheaf also moves to dismiss the alter ego claim for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).  *Id.*  Wheatsheaf argues that Ozone's good faith and fair dealing claim is duplicative of its breach of contract claim and should fail for the same reason: Wheatsheaf was not contractually obligated to fund all of TriStrata's obligations under the TSA.  *Id.* at 13.  Specifically, Wheatsheaf argues, Ozone's interpretation of the APA was rejected by the Receivership Court twice.  *Id.*  Wheatsheaf next argues that Ozone's alter ego claim fails because (1) the Amended Complaint fails to state a claim for alter ego relief and (2) the claim "challenges decisions made by the Court-appointed Receiver and the Superior Court" and is therefore barred by the *Rooker-Feldman* and *Burford* doctrines.  *Id.* at 12.

**1.  Breach of Implied Duty of Good Faith and Fair Dealing**

Under Washington law, every contract contains "an implied duty of good faith and fair dealing . . . [that] obligates the parties to cooperate with each other so that each may obtain the full benefit of performance."  *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991).  The covenant "requires only that the parties perform in good faith the obligations imposed by their agreement" and thus "arises only in connection with terms agreed to by the parties."  *Id.*; *see also Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1184 (W.D. Wash. 2013) (noting that "[t]he implied duty of good faith and fair dealing arises out of the obligations created by a contract and only exists in relation to the performance of specific contract terms").  "[T]he duty of good faith and fair dealing arises when one party has discretionary authority to determine a future contract term."  *Rekhter v. State, Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014); *see*

*also Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d 628, 632 (Wash. Ct. App. 1997). It "cannot add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties." 323 P.3d at 1041.

In its amended complaint, Ozone alleges that Wheatsheaf breached its implied duty of good faith and fair dealing "[b]y refusing to fund TriStrata's performance of all transactions contemplated by the APA, including all of TriStrata's obligations under the TSA, as well as taking other bad-faith actions . . . (including inducing Ozone to resolve certain service-related claims in order to prevent TriStrata from fulfilling its obligations to Ozone)." Dkt. # 79 ¶ 62. Ozone's good faith and fair dealing claim is premised on Wheatsheaf's alleged failure to meet its obligations to fund TriStrata under Section 6.05 and TriStrata's subsequent inability to fulfill its obligations to Ozone. Dkt. # 79 ¶¶ 29, 62. Because TriStata is not a party to this litigation and any claims against TriStrata have already been deemed waived and released in Superior Court, the Court need not consider whether TriStrata failed to fulfill its obligations. *See WGUS BCO LLC d/b/a/ Ozark v. Ozone Int'l, LLC*, No. 20-2-07562-SEA. The Court need only consider whether Ozone has plausibly stated a good faith and fair dealing claim against Wheatsheaf with respect to its own obligations under the "terms agreed to by the parties." *Badgett*, 807 P.2d at 360. The Court determines that it has not.

The terms agreed to by the parties are encapsulated within Section 6.05. As noted earlier, Wheatsheaf was not a party to the TSA. Wheatsheaf was a party to the APA solely for the purposes of Section 6.05. Pursuant to this section, Wheatsheaf had two discrete obligations: (1) to ensure that TriStrata had sufficient funding to make payment of the Purchase Price and (2) to ensure that TriStrata had sufficient funding "to consummate the transactions contemplated by this Agreement." Dkt. # 1-1 at 45. Ozone does not allege that the first obligation provides Wheatsheaf with discretionary authority, nor does Ozone dispute that Wheatsheaf breached the first obligation. The dispute here again arises from the second obligation and the meaning of "the transactions

ORDER – 15

contemplated by this Agreement."

Ozone claims that Section 6.05 granted Wheatsheaf "with discretion to determine how much cash was 'sufficient . . . to enable' TriStrata to 'consummate the transactions contemplated by this Agreement.'" Dkt. # 83 at 15. Ozone alleges that Wheatsheaf "exercised this discretion in bad faith" because "TriStrata did not have sufficient funds to purchase the Excluded Contracts contemplated in APA § 7.08 and the TSA, or the additional equipment and inventory Ozone transferred after Closing." *Id.* The Court finds no such discretion afforded to Wheatsheaf. Instead, Section 6.05 requires that Wheatsheaf provide funding for "the consummation of the transactions contemplated by this Agreement," which is explicitly defined in Section 3.01 of the APA as the Closing. Wheatsheaf was thereby obligated to pay the $9.99 million as the Purchase Price, which is undisputed, and pay for any costs related to the Closing of the APA pursuant to Section 6.05. Ozone's interpretation of Wheatsheaf's obligations to fund all of TriStrata's obligations *after* the Closing is simply inconsistent with the explicit language of the APA.

Ozone's efforts to inject discretionary authority into the terms of the APA are similarly unavailing. Ozone's claim that Wheatsheaf "abused its discretion to not purchase *any* Excluded Contracts" pursuant to the TSA, Dkt. # 83 at 16, fails because Wheatsheaf was not a party to the TSA and therefore had no discretionary authority to purchase Excluded Contracts. Ozone's allegation that Wheatsheaf "used its discretion to cause TriStrata to file for voluntary Receivership, thus avoiding its obligations to Ozone," Dkt. # 83 at 16, fails because it is untethered to any contractual term agreed to by Wheatsheaf. *See Rekhter*, 323 P.3d at 1041 (holding that the duty of good faith and fair dealing "cannot add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties").

Ozone's reliance on cases such as *Accretive Tech. Grp., Inc. v. Adobe Sys., Inc.*, 2015 WL 4920079 (W.D. Wash. Aug. 17, 2015) and *Lucero v. Cenlar FSB*, 2016 WL 337221 (W.D. Wash. Jan. 28, 2016) is accordingly misplaced, as the courts in both cases

ORDER – 16

analyzed good faith and fair dealing claims with respect to defendants' use of discretionary authority to interpret or apply a contract provision. *See Lucero* at *6 (holding that "[b]ecause [the defendant] had the discretionary authority to interpret and apply the contract provision, it was bound to do so in good faith"); *see Accretive* at *9 (holding that defendant's discretion in refunding malfunctioning software provided a basis for a breach of a duty of good faith and fair dealing claim). In contrast to these cases, the Court finds that Section 6.05 provides no discretionary authority to either party to determine a contract term.

Absent discretionary authority, Ozone's claim for breach of the duty of good faith and fair dealing fails. *See Badgett*, 807 P.2d at 360 (holding that "[a]s a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms"). Moreover, the absence of any discretionary authority to support a duty of good faith and fair dealing renders Ozone's breach of good faith and fair dealing claim duplicative of its breach of contract claim. Because the Court previously granted summary judgment in favor of Wheatsheaf on the breach of contract claim as a matter of law, the good faith and fair dealing claim is **dismissed with prejudice**, and the Court need not address Wheatsheaf's alternative arguments for dismissal.

### 2. Alter Ego Claim

In the amended complaint, Ozone seeks declaratory judgment that Wheatsheaf is TriStrata's and WGUS's alter ego and therefore "responsible for TriStrata's obligations to Ozone under the APA and the transactions contemplated by the APA." Dkt. # 79 ¶ 82. Pursuant to this claim, Ozone seeks to hold Wheatsheaf accountable for TriStrata's representation in Section 6.07 of the APA that "TriStrata would stay solvent, 'be able to pay its debts as they become due,' and that '[i]n connection with the transactions contemplated hereby, [TriStrata] has not incurred, and has no plans to incur, debts beyond its ability to pay as they become absolute and matured.'" Dkt. # 79 ¶ 84. Ozone

alleges that TriStrata breached that representation, and that breach "should be imputed to [Wheatsheaf]." *Id.* Ozone also argues that Wheatsheaf is liable for all of TriStrata's obligations based on the following:

> TriStrata breached the APA and TSA by: (i) failing to perform services for Ozone in a timely and workmanlike manner consistent with Ozone's preferred standard for performance under Section 1.02(a) of the TSA; (ii) failing to pay Ozone for inventory and equipment transferred to TriStrata at TriStrata's request pursuant to Section 2.01(b) of the TSA; (iii) failing to pay the required Transfer Price for Excluded Customer Contracts pursuant to Sections 3.03 and 3.04 of the TSA; and (iv) breaching TriStrata's implied duty of good faith and fair dealing toward Ozone, thereby depriving Ozone of the full benefit of TriStrata's performance under the APA and TSA.

Dkt. # 79 ¶ 85. Based on the foregoing alleged breaches, Ozone asserts that Wheatsheaf is liable for at least $31,025,000. *Id.* at 18.

In its motion to dismiss, Wheatsheaf argues that this the Court is barred from reviewing this claim by the *Rooker-Feldman* doctrine, which precludes federal district courts from hearing "de facto appeals from state court judgments." Dkt. # 81 at 18 (citing *Carmona v. Carmona*, 603 F.3d 1041, 1050 (9th Cir. 2010)). Wheatsheaf also asserts that Ozone's alter ego claim is barred by the *Burford* doctrine, which requires federal district courts to abstain from exercising jurisdiction "when it would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern or would require the court to address difficult questions of state law bearing on policy problems of substantial public import." Dkt. # 81 at 21 (citing *New Orleans Pub. Serv. v. New Orleans*, 491 U.S. 350, 361 (1989) (internal quotations omitted)). Wheatsheaf next argues that a declaratory judgment that Wheatsheaf is the alter ego of WGUS would serve no useful purpose. *Id.* at 23. Finally, Wheatsheaf argues that the Amended Complaint does not allege the elements of an alter ego claim. Dkt. # 81 at 25. The Court will first consider the *Rooker-Feldman* argument to determine whether it has jurisdiction over the claim at issue.

ORDER – 18

*a.* Rooker-Feldman *Doctrine*

The *Rooker-Feldman* doctrine precludes district courts "from exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 463 (2006). Such appellate jurisdiction under which a state-court judgment may be reversed or modified is reserved exclusively for the Supreme Court of the United States under 28 U.S.C. § 1257. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005). *Rooker-Feldman* may also bar district court review when "the parties do not directly contest the merits of a state court decision," but pursue "a *de facto* appeal from a state court judgment." *Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 859 (9th Cir. 2008). A federal suit constitutes such a *de facto* appeal when "claims raised in the federal court action are inextricably intertwined with the state court's decision such that the adjudication of the federal claims would undercut the state ruling or require the district court to interpret the application of state laws or procedural rules." *Id.* (internal quotations and citation omitted). *Rooker-Feldman* "applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court *and* seeks as her remedy relief from the state court judgment." *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004). The Court must therefore "pay close attention to the *relief* sought by the federal-court plaintiff." *Bianchi v. Rylaarsdam*, 334 F.3d 895, 900 (9th Cir. 2003).

In 2005, the Supreme Court clarified the narrow application of the doctrine, noting that district courts sometimes construed the doctrine too broadly, "overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law." 544 U.S. at 283. The Court held that the doctrine is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 283. In other words, the doctrine is only applicable if four requirements are met: (1) a federal court plaintiff lost in state court; (2) the plaintiff

complains of injuries caused by the state court judgment; (3) the plaintiff is requesting the district court to review and reject that judgment; and (4) the state court judgment had been rendered before the district court proceedings commenced. *Id.*

The Court further held that a district court is not barred "from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* at 293. Indeed, the Court noted that if a plaintiff presents an independent claim in federal court, "albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id. Rooker-Feldman*, the Court noted, does not bar parallel state and federal litigation:

> When there is parallel state and federal litigation, *Rooker–Feldman* is not triggered simply by the entry of judgment in state court. This Court has repeatedly held that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction. Comity or abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation. But neither *Rooker* nor *Feldman* supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court.

*Id.* at 292 (internal citations and quotations omitted). Parallel state and federal litigation is not when a plaintiff has "repaired to federal court to undo the [state] judgment in its favor" but rather when it "filed suit in Federal District Court . . . to protect itself in the event it lost in state court on grounds . . . that might not preclude relief in the federal venue." *Id.* at 293-94. This aptly characterizes the situation before the Court.

Because the state court judgment was not yet rendered before Ozone commenced proceedings in this Court, *Rooker-Feldman* does not apply here. The state proceedings at issue began on May 31, 2019, when TriStrata filed a petition for the appointment of a receiver in state court. Dkt. # 79 ¶ 2. Six weeks later, on July 17, 2019, Ozone filed suit

against Wheatsheaf in this Court, alleging breach of contract, fraud, and negligent misrepresentation, and seeking a declaratory judgment that Wheatsheaf is an alter ego for Tristrata (and a second subsidiary) and is therefore responsible for Tristata's obligations under the TSA. Dkt. # 1 at 12-17. On August 16, 2019, the state court entered an order granting the Receiver's motion to assume and assign contracts and leases and sale of related assets. *See* Dkt. # 82-18. This order was later deemed by the state court to be "a final ruling on Ozone's claims against TriStrata." Dkt. # 82-21 at 3-4. On November 13, 2019, the court terminated the Receivership. *See* Dkt. # 82-19. On January 6, 2021, Ozone filed an amended complaint[2] asserting the same three claims as in its original complaint, again seeking declaratory relief that Wheatsheaf, as the alter ego of TriStrata and WGUS, is liable for TriStrata's obligations to Ozone, and asserting a new claim of breach of the duty of good faith and fair dealing. Dkt. # 79 at 13-18. This timeline clearly demonstrates that the state court judgment had not been rendered before the district court proceedings commenced. The final requirement for *Rooker-Feldman* has therefore not been satisfied.

Moreover, Ozone filed suit in federal court against Wheatsheaf, a non-party to the state action, seeking declaratory relief that Wheatsheaf was the alter ego for TriStrata and liable for TriStrata's obligations, and alleging various other claims against Wheatsheaf.

---

[2] This Court finds no support for Wheatsheaf's argument that the *Rooker-Feldman* exception for parallel state and federal proceedings "does not apply when the state court litigation resolves before the amended complaint [is] filed in federal court." Dkt. # 81 at 19 n.16. In the case cited by Wheatsheaf to advance this proposition, the district court found that the federal action was *not* parallel to the state action and that the plaintiff expressly sought a reversal of state court rulings. *Pellegrini v. Ne. Univ.*, 323 F. Supp. 3d 182, 185-86 (D. Mass. 2018), *aff'd*, No. 18-2031, 2019 WL 10632972 (1st Cir. June 3, 2019). Similarly, in the case cited by the *Pellegrini* court in the section cited by Wheatsheaf, the Ninth Circuit found that there was no parallel state and federal litigation. *See Marciano v. White*, 431 Fed. App'x 611 *2 (2011). This Court finds no other support for disregarding the exception for parallel state and federal court litigation, which precludes application of the *Rooker-Feldman* doctrine.

The Receivership Court, on the other hand, addressed only debts owed by TriStrata. The action before this Court was therefore parallel to the state action and not merely an effort to undo a state-court judgment. *See Pellegrini v. Ne. Univ.*, 323 F. Supp. 3d 182, 185 (D. Mass. 2018), *aff'd*, No. 18-2031, 2019 WL 10632972 (1st Cir. June 3, 2019) (noting that "[f]or there to be parallel state and federal litigation there must be an independent claim, meaning that the defendant's conduct which harmed the plaintiff is separate from the state court decision") (internal citation and quotations omitted)). Ozone's allegations that Wheatsheaf created a sham corporate structure through which it failed to adequately capitalize TriStrata prior to the Receivership, Dkt. # 79 ¶ 83, among other things, were not fully litigated or decided in the state court judgment disposing of TriStrata's assets. For the foregoing reasons, the Court finds that Ozone's alter ego claim does not fall within the category of cases barred from district court review by the *Rooker-Feldman* doctrine.

      *b.* Burford *Doctrine*

      Similarly, the Court finds Wheatsheaf's argument for abstention based on the *Burford* doctrine to be unavailing. The *Burford* doctrine, unlike *Rooker-Feldman*, does not deprive a federal district court of jurisdiction, but rather asks whether a federal district court should decline to exercise jurisdiction "as a matter of sound equitable discretion." *Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943). Under *Burford*, federal courts should abstain from deciding (1) "cases presenting difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar" or (2) cases whose adjudication in a federal court "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *First Penn-Pac. Life Ins. Co. v. Evans*, 304 F.3d 345, 348 (4th Cir. 2002) (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)). The Supreme Court has held that abstention from jurisdiction

is "the exception, not the rule" and described "federal courts' obligation to adjudicate claims within their jurisdiction as virtually unflagging." 491 U.S. at 359.

In determining whether to abstain from jurisdiction, a consideration of the facts in *Burford* is useful. The Supreme Court in the case considered an order that was "part of the general regulatory system devised for the conservation of oil and gas in Texas, an aspect of 'as thorny a problem as has challenged the ingenuity and wisdom of legislatures.'" *Burford*, 319 U.S. at 318 (internal citation omitted). The Court's decision was summarized as follows:

> [A] suit seeking review of the reasonableness under Texas state law of a state commission's permit to drill oil wells should have been dismissed by the District Court. The reasonableness of the permit in that case was not of transcendent importance, but review of reasonableness by the federal courts in that and future cases, where the State had established its own elaborate review system for dealing with the geological complexities of oil and gas fields, would have had an impermissibly disruptive effect on state policy for the management of those fields.

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 815 (1976).

This Court's review of the alter ego claim does not fall within the same category of cases requiring abstention. Wheatsheaf argues that abstention is required because "receiverships are inherently local affairs," Dkt. # 81 at 21, and "federal courts have frequently abstained to avoid interfering with state receivership proceedings," *id.* (quoting *First Penn-Pac. Life Ins. Co.*, 304 F.3d. at 350). However, as Ozone notes, the Receivership has ended, and TriStrata no longer exists. Dkt. # 83 at 21. Ozone's alter ego claim, it argues, would not disrupt state efforts to establish Washington administrative or regulatory policy. *Id.* The Court agrees. The Court finds that consideration of Ozone's alter ego claim would not be disruptive to state receivership policy. Moreover, "mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction." 424 U.S. at 815.

*c. Statement of Alter Ego Claim*

ORDER – 23

Under Washington's alter ego doctrine[3], a "court will pierce the veil and find a corporate entity is one and the same with another corporate entity when the corporate form has been intentionally used to violate or evade a duty." *Rapid Settlements, Ltd.'s Application for Approval of Transfer of Structured Settlement Payment Rts.*, 271 P.3d 925, 930 (Wash. Ct. App. 2012). "As a general rule, a corporate entity and the limitations on liability afforded by corporate structure will be respected by the courts." *Culinary Workers & Bartenders Union No. 596 Health & Welfare Tr. v. Gateway Cafe, Inc.*, 588 P.2d 1334, 1343 (Wash. 1979). Even when a subsidiary is wholly owned, the parent corporation is generally not liable for the subsidiary's torts. *Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, No. C08-1372 RSM, 2010 WL 2079694, at *7 (W.D. Wash. May 20, 2010), *aff'd*, 447 F. App'x 814 (9th Cir. 2011).

To pierce the corporate veil, a plaintiff must show that "(1) that the corporate form was intentionally used to violate or evade a duty, and (2) disregard of the corporate form is necessary to prevent unjustified loss to the injured party." *Campagnolo*, 2010 WL 2079694, at *6. Under the second element, "[i]ntentional misconduct must be the cause of the harm that is avoided by disregard." *Meisel v. M & N Mod. Hydraulic Press Co.*, 645 P.2d 689, 693 (Wash. 1982). The Supreme Court of Washington in *Meisel* held that though the plaintiff "was harmed by the dissolution of [the corporate entity,] . . . harm

---

[3] Ozone asserts that Delaware law applies to its alter ego claim because TriStrata is a Delaware LLC. Dkt. # 83 at 21. Ozone relies on a footnote in an unreported federal district court case citing a Second Circuit decision. *See Bridgepoint Constr. Servs. Inc. v. Lassetter*, No. CV-16-00078-PHX-JJT, 2017 WL 372950, at *2 (D. Ariz. Jan. 26, 2017) (citing *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993)). The Ninth Circuit, however, "appl[ies] the law of the forum state in determining whether a corporation is an alter ego of an individual." *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir.), *opinion amended on denial of reh'g sub nom. Sec. & Exch. Comm'n v. Hickey*, 335 F.3d 834 (9th Cir. 2003); *see also Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387, 1391 (9th Cir. 1993) (same). Although Delaware and Washington state laws on alter ego do not differ significantly, the Court will apply the alter ego law of Washington as the forum state.

alone does not create corporate misconduct." The court explained its reasoning accordingly:

> Separate corporate entities should not be disregarded solely because one cannot meet its obligations. The absence of an adequate remedy alone does not establish corporate misconduct. The purpose of a corporation is to limit liability. Unless we are willing to say fulfilling that purpose is misconduct, [the plaintiff] is hard put to argue a theory of corporate disregard.

*Id.*

Here, Ozone asserts that it was harmed by TriStrata's alleged contractual breaches, which resulted in damages of at least $31,025,000. Dkt. # 79 at 18. It alleges that Wheatsheaf, which controlled TriStrata, intentionally under-capitalized it, breached TriStrata's contractual obligations and its duty to act in good faith toward Ozone, and transferred assets to a second subsidiary to evade obligations to Ozone, among other acts of corporate misconduct, in support of the first prong of the alter ego test. Dkt. # 79 ¶¶ 81-87. However, the Court finds that Ozone has failed to plausibly assert facts in support of the second prong to show that it suffered or will suffer "unjustified loss," rendering disregard of the corporate form necessary. Ozone's claim for $31,025,000 based on TriStrata's alleged contractual breaches has already been resolved by the Receivership court: Ozone obtained numerous valuable assets in exchange for waiving all of its claims against TriStrata. *See* Dkt. # 82-18. This court-approved compromise precluded Ozone from pursuing any additional claims against TriStrata, including Ozone's claim for $31,0250,000.

Ozone attempted to assert its "undisputed claim" for approximately $31 million as a setoff in a related state court proceeding and again as damages in its amended complaint before this Court. *See* Dkt. # 82-20; Dkt. # 79. Having considered whether the claim was still valid after the Receivership, Judge Ramseyer ruled that it was not. She concluded that "[t]he fact that Ozone filed its Proof of Claim in the Receivership does not mean that its $31 million claim was established as a matter of law, or that Ozone may

ORDER – 25

continue to assert that claim against third-parties." Dkt. # 82-21 at 3-4. Judge Ramseyer concluded that because Ozone entered into a compromise in which it received valuable consideration and voluntarily waived and released all other claims, it was barred from asserting the $31 million claim by res judicata and collateral estoppel. Dkt. # 82-20.

Accordingly, this Court finds that because any losses suffered by Ozone based on TriStrata's conduct have been addressed in the Receivership—wherein Ozone obtained valuable assets from TriStrata in exchange for waiving all other claims—Ozone cannot now assert that it will suffer "unjustified loss" without disregard of the corporate form. Unable to satisfy the second prong of an alter ego claim, Ozone's alter ego claim fails. For these reasons, the Court **dismisses** the alter ego claim for failure to state a claim under Rule 12(b)(6).

## V. CONCLUSION

Based on the foregoing reasons, the Court **GRANTS** Defendant Wheatsheaf's Motion for Partial Summary Judgment, Dkt. # 65, and Motion to Dismiss for Failure to State a Claim, Dkt. # 81.

DATED this 23rd day of June, 2021.

The Honorable Richard A. Jones
United States District Judge

ORDER – 26